**TA LEGAL GROUP PLLC**
Taimur Alamgir, Esq. (TA 9007)
315 Main Street, Second Floor
Huntington, NY 11743
(914) 552-2669
tim@talegalgroup.com
*Attorneys for Plaintiff Crystal Carpenter*
*FLSA Collective Plaintiffs, and Class Members*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CRYSTAL CARPENTER, *on behalf of herself, FLSA Collective Plaintiffs, and Class Members* | **Case No.:** |
| Plaintiff, | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| - against - | **Jury Trial Demanded** |
| SHAKE SHACK ENTERPRISES LLC, | |
| Defendant. | |

Plaintiff, Crystal Carpenter ("Plaintiff or "Ms. Carpenter"), by and through her undersigned counsel of record, TA Legal Group PLLC, hereby files this Class and Collective Action Complaint ("Complaint") against Defendant Shack Shake Enterprises LLC ("referred to herein as "Defendant" or "Shake Shack"), and alleges as follows:

**INTRODUCTION**

1.      Ms. Carpenter, a longtime former Shake Shack employee, brings this case to hold Shake Shack accountable for a class and collective-wide failure to pay overtime and other systematic wage-and-hour violations, and for subjecting her to unlawful discrimination on the basis of age and caregiver status, retaliation for complaining about the discrimination she

1

endured, and a hostile work environment, resulting in Plaintiff's unlawful termination after 8 years of devoted service.

2.    Plaintiff and other Shake Shack Shift Managers were routinely required to work uncompensated regular and overtime hours in violation of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"), due to policies of requiring unpaid off the clock work. In addition, Shake Shack failed to pay Ms. Carpenter and other Shake Shack Shift Managers premiums due under the NYCFWW for shift changes imposed with less than fourteen (14) days notice and "clopening" shifts (i.e., being required to work the last shift and the following morning).

3.    Ms. Carpenter's illegal termination was orchestrated by her much younger supervisor, General Manager Shellyann Lovelace ("Lovelace"). Ms. Lovelace made no secret of her animus towards Ms. Carpenter's age and caregiver status, subjecting Ms. Carpenter to egregious and unrelenting harassment on the job on a daily basis. Ms. Lovelace openly mocked and belittled Ms. Carpenter as "getting old," rudely questioned Ms. Carpenter's intelligence and ability to do her job properly. Ms. Lovelace yelled at Ms. Carpenter to stop acting like a "grandmother," and severely admonished Ms. Carpenter when Ms. Carpenter invoked her caregiver status, in addition to numerous other instances of discriminatory harassment.

4.    Shake Shack did nothing to address the discrimination or harassment, despite Ms. Carpenter's repeated complaints. Shake Shack ultimately fired Ms. Carpenter based on a wildly false and pretextual account planted by Ms. Lovelace.

5.    As further discussed below, Ms. Carpenter was fired due to unlawful age and caregiver status discrimination, and in retaliation for protected complaints. Ms. Carpenter's termination additionally constituted a wrongful discharge under the NYCWDL

6.     As discussed herein, Ms. Carpenter seeks to hold Shake Shack accountable for its unlawful actions.

## CLAIMS

7.     Plaintiff alleges, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., that she and FLSA Collective Members (as defined below) are entitled to recover damages from Defendant for: (1) unpaid overtime wages and (2) liquidated damages. Plaintiff additionally seeks attorney's fees and costs in connection with this claim.

8.     Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL") and Fed. R. Civ. P. 23, that she and Class Members (as defined below) are entitled to recover damages from Defendant for: (1) unpaid regular and overtime wages, (2) liquidated damages, and (3) statutory penalties for violations of the wage-and-hour notice requirement (NYLL 195.1) and wage statement requirement (NYLL 195.3). Plaintiff additionally seeks attorney's fees and costs in connection with this claim.

9.     Pursuant to New York City Fair Work Week Law ("NYCFWW") and Fed. R. Civ. P. 23, Ms. Carpenter alleges that she and NYC Subclass Members (as defined below), are entitled to recover unpaid premiums due under the NYCFWW for (1) shift changes imposed with less than fourteen (14) days notice and (2) "clopening" shifts. Plaintiff additionally seeks attorney's fees and costs in connection with this claim.

10.     Pursuant to the Age Discrimination in Employment Act ("ADEA"), Ms. Carpenter seeks to hold Defendant liable for subjecting her to discrimination. In connection with her ADEA claims, Ms. Carpenter seeks declaratory, injunctive, and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages and attorneys' fees and costs.

11.     Pursuant to New York State Human Rights Law, New York State Human Rights Law, New York State Executive Law, Article 15 §§ 290 et seq. ("NYSHRL"), Ms. Carpenter looks to hold Defendant liable for unlawful age and caregiver discrimination, wrongful discharge, retaliation, and hostile work environment in response to protected complaints and opposition activity during employment, and seeks damages including declaratory, injunctive and equitable relief, and monetary damages including economic damages, compensatory damages, punitive damages and attorneys' fees and costs.

12.     Pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), Ms. Carpenter seeks to hold Defendant liable for age and caregiver discrimination, retaliation, hostile work environment, and wrongful discharge and seeks damages including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

13.     Pursuant to New York City Wrongful Discharge Law ("NYCWDL"), Ms. Carpenter seeks to hold defendants liable for wrongful discharge and seeks damages including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION, VENUE, AND STATUTORY PREREQUISITES

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.§ 1367.

15.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

16.     All administrative prerequisites have been satisfied. Plaintiff timely filed a charge with the Equal Employment Opportunity Commission, and was issued a Notice of Right to Sue. Exhibit A (Notice of Right to Sue).

17.     Plaintiff timely filed suit within 90 days of the issuance of the Notice of Right to Sue.

18.     Defendant satisfies the ADEA employee threshold of 20 employees and employed 4 or more employees at all times relevant.

19.     Plaintiff's claims under New York State and New York City law were tolled by the State of New York from March 23, 2020 through November 3, 2020, for 228 days in connection with the state of emergency declared in connection with COVID-19 and Executive Order (A Cuomo) 202.8. and subsequent orders 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67, 202.72 [9 NYCRR 8.202.14, 8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72. *Matter of Echevarria v Board of Elections in the City of NY*, 183 A.D.3d 857, 858, 122 N.Y.S.3d 904 [2d Dept, May 21, 2020]).

20.     Shake Shack engages in an enterprise whose annual volume of sales made or business done is not less than $500,000 and the activities of which affect interstate commerce, in that the employees of Shake Shack (including Plaintiff) handle goods and materials produced outside of New York that have moved in interstate commerce. Shake Shack is thus an employer subject to the jurisdiction of the FLSA.

21.     At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

22.     At all relevant times, Shake Shack was, and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL and any Regulations thereunder.

23.     At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class Members was directly essential to the business operated by Shake Shack.

24.     Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

### THE PARTIES

25.     Ms. Carpenter is a resident of Brooklyn, NY.

26.     Shake Shack Enterprises LLC is a domestic limited liability company organized under the laws of the State of New York, with a corporate headquarters and address for service of process located at 225 Varick St., Suite 301, New York, NY 10014.

27.     Shake Shack owns and operates an international chain of fast food restaurants, including, as of the date of filing, 62 locations in New York State. Exhibit B (Table of Shake Shack Restaurant locations in NYS).

28.     All Shake Shack Restaurant locations in New York State comprise a "single employer" or "single integrated enterprise" for purposes of all causes of action asserted. Shake Shack Restaurant locations in New York have interrelated operations, centralized human resources and legal departments, centralized control of labor relations, common senior management, and common ownership and financial control.

a. Employees, including Ms. Carpenter, are interchangeable across multiple restaurant locations. Ms. Carpenter was internally transferred between locations.

b. HR and employment policies are centralized across all Shake Shack locations in New York.

c. There is a single employee handbook applicable to all locations.

d. Payroll is commonly administered for employees across locations through Shake Shack Enterprises LLC.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

29.    Plaintiff brings claims for relief as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of all Shift Managers employed by Shake Shack Restaurant at locations in New York State, on or after the date that is six (6) years before the filing of the Complaint in this action ("FLSA Collective Plaintiffs").

30.    At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Shake Shack's decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them overtime wages. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

31.    The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Shake Shack. Notice can be

provided to the FLSA Collective Plaintiffs via first class mail to the last address known to Shake Shack.

## RULE 23 CLASS ACTION ALLEGATIONS

32.     Plaintiff seeks relief under Federal Rule of Civil Procedure 23 on behalf of a class consisting of all Shift Managers employed by Shake Shack at its restaurant locations in New York State, on or after the date that is six (6) years before the filing of the Complaint in this action (hereafter "Class" or "Class Members").

33.     Within the Class, Plaintiff seeks relief under Fed. R. Civ. P. 23 on behalf of a subclass consisting of all Shift Managers employed by Shake Shack at its restaurant locations in New York City, on or after the date that is six (6) years before the filing of the Complaint in this action (hereafter "NYC Subclass" or "NYC Subclass Members").

34.     Throughout the relevant periods, Plaintiff and Class Members have been similarly situated, sharing substantially similar job requirements, pay provisions, and subjected to Shake Shack's uniform decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules. This unified treatment resulted in widespread failures, in contravention of the NYLL, to pay Plaintiff and Class Members:

      a.     Regular wages.

      b.     Overtime wages.

      c.     Liquidated damages.

      d.     Failure to provide required wage notices and statements in compliance with NYLL § 195.1 and § 195.3, respectively.

e.  As to NYC Subclass Members, failure to pay premiums due under the NYCFWW for shift changes imposed with less than fourteen (14) days notice.

f.   As to NYC Subclass Members, failure to pay premiums due under the NYCFWW for "clopening" shifts The claims of Plaintiff stated herein are essentially the same as those of Class Members.

35.  Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Shake Shack. The hours assigned and worked, the position held, and rates of pay for each Class Member are also determinable from Shake Shack's records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Shake Shack. Notice can be provided by means permissible under F.R.C.P. 23.

36.  The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Shake Shack there is no doubt that there are more than forty (40) members of the Class. There are similarly more than forty (40) members of the subclass.

37.  Shake Shack's enterprise-wide policies and practices affected all Class Members similarly, and Shake Shack benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and other Class Members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

38.    Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

39.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

40.    Because losses, injuries and damages suffered by each of the individual Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs.

41.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Shake Shack and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common,

class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

42.    There are questions of law and fact common to the Class which predominate, including:

    a.    What are and were the policies, practices, programs, procedures, protocols and plans of Shake Shack regarding the types of work and labor for which Shake Shack did not pay Plaintiff and Class Members properly.

    b.    At what common rate, or rates subject to common methods of calculation, were and are Shake Shack required to pay Plaintiff and Class Members for their work;

    c.    Whether Shake Shack failed to compensate Plaintiff and Class Members for all hours worked.

    d.    Whether Shake Shack failed to pay Plaintiff and Class Members overtime pay for hours worked in excess of 40 each week.

    e.    Whether Shake Shack unlawfully failed to provide Plaintiff and Class Members wage notices in compliance with NYLL § 195.1.

    f.    Whether Shake Shack unlawfully failed to provide Plaintiff and Class Members wage statements in compliance with NYLL §195.3.

    g.    whether Shake Shack failed to pay Plaintiff and NYC Subclass Members premiums due under the NYCFWW for shift changes imposed with less than fourteen (14) days notice .

    h.    whether Shake Shack failed to pay Plaintiff to pay premiums due under the NYCFWW for working "clopening" shifts

The claims of Plaintiff stated herein are essentially the same as those of Class Members and NYC Subclass Members.

## STATEMENT OF FACTS

### *Plaintiff's Employment at Shake Shack*

43.     Crystal Carpenter is a 52-year-old resident of Brooklyn NY. She is responsible for providing care for her father, an elderly cancer patient. She assists with her father's many medical needs as well as day-to-day living.

44.     Ms. Carpenter was employed by Shake Shack from 2016 until June 12, 2024.

45.     Ms. Carpenter was initially hired by Shake Shack to work as a Team Member at the Flatbush - Barclays Center Shake Shack location located at 170 Flatbush Avenue, Brooklyn, NY 11217.

46.     In 2019 Shake Shack promoted Ms. Carpenter to Shift Manager (a non-exempt position) and transferred her to the Shake Shack location at the Kings Plaza shopping center, at 5100 Kings Plaza, Brooklyn, NY 11234, where Ms. Carpenter worked until her unlawful termination on June 10, 2024.

47.     During her lengthy tenure at the Shake Shack, Ms. Carpenter was recognized by Shake Shack for her devotion to the company and her embodiment of the company's guiding principle, "The Shack Pact" which states as follows:

> ***Lead with Enlightened Hospitality***
> *We prioritize our team members and take care of their needs so that they can take care of our guests and the community.*
>
> ***Do the Right Thing and Hold Ourselves Accountable***
> *Every decision we make supports our purpose mission, brand values, and the culture we want to create.*

> ***Uplift and Care for Each Other***
> *All are welcome at Shake Shack. The environment in every Shack is a respectful, welcoming, and inclusive environment.*
>
> ***Optimistic and Embrace Ongoing Learning***
> *We have a learning culture and are committed to developing ourselves and others, both personally and professionally.*
>
> ***Stand For Something Good***
> *Our individual actions matter in the pursuit of our purpose and mission. Elevating everything we do and creating uplifting experiences for others is the goal.*

48.     As a Shake Shack employee, **Ms. Carpenter embodied and exemplified the values espoused in the Shake Pact**.

49.     Shake Shack's egregious and illegal treatment of Ms. Carpenter demonstrates that the company does not practice what it preaches.

50.     During her employment, Shake Shack repeatedly recognized Ms. Carpenter for strong performance, devotion to her job, and dedication to the company and its values.

51.     Shake Shack also recognized Ms. Carpenter for her commitment to the values espoused in the Shake Pact. Ms. Carpenter spearheaded Shake Shack catering events with local schools in the vicinity of Kings Plaza, as well as charitable events in the community. Ms. Carpenter's efforts served to promote a positive image of the company among community members, in alignment with Shack Pact.

52.     In 2019, Shake Shack selected Ms. Carpenter to appear on the Shake Shack's official Instagram in a promotional video for the company on how to prepare the Chicken Shack.

53.     In 2022, Shake Shack honored Ms. Carpenter by nominating her for the company's Woman of the Year award.

54.     At all relevant times, the Kings Plaza Shake Shack location was predominantly staffed by employees in their late teens and early to mid-20s. Such employees looked to Ms.

Carpenter for guidance, wisdom and mentorship. Customers and many members of the community also greatly respected Ms. Carpenter.

**_Class And Collective Action Claims For Unpaid Regular and Overtime Wages_**

55.    At times relevant during her employment at Shake Shack as a Shift Manager (a non-exempt position), Plaintiff was compensated on an hourly basis, at a straight time base hourly rates as follows:

     a.  $17.00 per hour until 2022.

     b.  $21.00 per hour during 2023.

     c.  $21.00 per hour during 2024.

56.    During the relevant period, Plaintiff regularly worked approximately 8.5-9.5 hours per day, 5 days per week, for a total of approximately 41-45 hours per week. In addition, Plaintiff worked in excess 50 or more hours during weeks in which she was required to pick up additional shifts.

57.    Like Plaintiff, FLSA Collective Plaintiffs and Class Members (all non-exempt Shift Managers) were also compensated on an hourly basis, and regularly worked in excess of 40 hours per week.

58.    Throughout her employment as a Shift Manager at Shake Shack, Plaintiff was not paid for all regular and overtime hours worked. Instead, owing to Shake Shack's unlawful policies and practices, Plaintiff was deprived of regular wages and overtime wages at 1.5x her regular rate for hours worked in excess of 40 per workweek.

59.    Wage statements issued to Plaintiff by Shake Shack reflect that Shack Shack failed to pay Plaintiff for all regular and overtime hours worked, as reflected by the following examples:

     a.   Per the wage statement at Exhibit C, p. 1, for the pay period of April 7, 2022 - April 13, 2022, Plaintiff worked 49.88 hours total, but was only paid for 34.88 hours worked, and was thus deprived of 5.12 at her straight time rate, and 9.88 hours of overtime pay at 1.5x her straight time rate of pay.

     b.   Per the wage statement at Exhibit C, p. 2, for the pay period of May 5, 2022 - May 11, 2022, Plaintiff worked 48.86 hours total, but was only paid for 33.66 hours worked at her straight time rate, and was thus deprived of 6.64 hours of compensation at her straight time rate, and 8.86 hours of overtime pay at 1.5x her straight time rate of pay.

     c.   Per the wage statement at Exhibit C, p. 3, for the pay period of October 27, 2022 - November 2, 2022, Plaintiff worked 51.68 hours total, but was only paid for 36.68 hours worked at her straight time rate, and was thus deprived of 3.32 hours of compensation at her straight time rate, and 11.68 hours of overtime pay at 1.5x her straight time rate of pay.

60.    Plaintiff was deprived of regular and overtime pay due to a systematic policy of failing to pay FLSA Collective Plaintiffs and Class Members the legally-required regular and overtime wages. FLSA Collective Plaintiffs and Class Members were similarly deprived of regular and overtime compensation for all hours worked.

61.    Throughout her employment as a Shift Manager at Shake Shack, Plaintiff was required to clock out each shift for a break, which was unpaid. However, Plaintiff was not permitted to have free and clear breaks, as she was required to stay at the restaurant or in its immediate vicinity, and was regularly called on to work by Shake Shack management despite being off-the-clock on break. Plaintiff was regularly required by Shake Shack management to

assist other staff with working the counter and fulfilling customer orders during her breaks.

62.    Due to this unlawful policy, Plaintiff was required to perform approximately 1.5-2 hours of regular and overtime work each week during purported breaks, for which she was not paid.

63.    Similarly, other Shift Managers were also subject to a requirement, imposed by to clock out for breaks. Like Plaintiff, other Shift Managers did not receive free and clear lunch breaks and were required to work off-the-clock during the purported breaks.

64.    In addition, during Plaintiff's tenure as a Shift Manager at Shake Shack, Plaintiff was required to perform unpaid post-shift work after clocking out, for which she was not paid. Specifically, Plaintiff was required to take out the trash and/or mop the back area once already clocked out, and was not paid for such off-the-clock post-shift work.

65.    Due to this unlawful policy, Plaintiff was required to perform approximately 1-1.5  hours of regular and overtime work each workweek after clocking out, for which she was not compensated.

66.    Like Plaintiff, FLSA Collective Plaintiffs and Class Members were required to perform unpaid off-the-clock post-shift work each workweek, for which they were not paid.

67.    Due to the aforementioned unlawful policies imposed by Shake Shack, Plaintiff was deprived of regular wages and overtime wages (at 1.5x her straight time rate). FLSA Collective Plaintiffs and Class Members were similarly subject to the same illegal common policies, and were thus similarly deprived of regular and overtime wages.

68.    Defendant never issued Plaintiff a compliant wage-and-hour notice setting forth his compensation or other information required under NYLL 195.1. Nor did Shake Shack issue

Plaintiff proper wage statements in compliance with NYLL 195.3.[1]

69.     Similarly, Class Members were not issued proper wage-and-hour notices or wage statements.

### *NYCFWW Claims on Behalf of Plaintiff and the NYC Subclass*

70.     Throughout her employment as Shift Manager at Shake Shack, Ms. Carpenter was frequently directed by Shake Shack to take on additional shifts by managers.

71.     As Shift Manager, Ms. Carpenter was regularly required by Shake Shack to pick up shifts at short notice substantially less than the 14 days required under the NYCFWW. In this regard, Ms. Carpenter was required to pick up complete or partial shifts when employees failed to come to work, were late, or were required to leave the workplace at short notice. Ms. Carpenter was also required at short notice to arrive at work early, prior to her expected shift, in order to coordinate deliveries.

72.     NYC Subclass Members were similarly required to pick up shifts at short notice substantially less than 14 days notice.

73.     During her employment, particularly during her tenure as Shift Manager, Ms. Carpenter was required to perform "clopenings," where an employee works both the last shift at

---

[1] In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being properly paid. Here, Defendant's failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendant's failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, and commission payments deprived employees of the ability to contest the pay provided by Defendant, allowed Defendant to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Member's rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Plaintiff and Class Members are therefore entitled to statutory damages.

night and the first shift the following day. Ms. Carpenter was regularly required to arrive at work early to coordinate deliveries before her expected shift on days that she had closed the restaurant down the night before.

74.    As one example of Ms. Carpenter's deprivation of premiums due to her under the NYCFWW, during spring 2024, Mamadou [LNU] regularly called out, citing either her religious commitments during Ramadan or giving no excuse. On those occasions, Ms. Carpenter was required to pick up Mamadou's evening shift at the last moment. Because Mamadou's shift was the last shift before closing, and because Ms. Carpenter was tasked with opening up the store in the morning, she was made to perform "clopenings". Ms. Carpenter was not provided the premiums required under law.

75.    Ms. Carpenter was required by Shake Shack to make schedule adjustments less than 14 days before the shift in question, approximately 4-5 times per week on average. Similarly, NYC Subclass Members were regularly required by Shake Shack to make schedule adjustments.

76.    In addition, Ms. Carpenter was required to perform "clopenings" 2-3 times each week on average. Similarly, NYC Subclass Members were regularly required by Shake Shack to perform "clopenings."

77.    As a fast-food worker in New York City, Ms. Carpenter was entitled under the NYCFWW Law to receive a premium payment for each occasion her schedule was adjusted less than 14 days before the shift affected.

78.    As a fast-food worker in New York City, Ms. Carpenter was also entitled to receive a $100 premium for each "clopening" worked.

79.    Shake Shack failed to pay Ms. Carpenter NYCFWW Law premiums in accordance with the law.

80.    Shake Shack paid Ms. Carpenter only 1-2 schedule change premium payments per week on average, even though Plaintiff regularly was required to change her schedule 5 or more times in a week and was entitled to premium payments for each said change.

81.    Similarly, NYC Subclass Members were not paid the required premiums for applicable shift changes.

82.    Shake Shack failed to pay Ms. Carpenter the $100 premium payable for the "clopenings" that she worked approximately 1-2 times per week.

83.    In addition, in violation of the NYCFWW Law, Ms. Carpenter was not given any choice to decline "clopenings." To the extent that Shake Shack ever paid Ms. Carpenter as required by the NYCFWW for a "clopening," Shake Shake nevertheless violated the law as it failed to obtain consent from Ms. Carpenter within 11 hours of the commencement of the second shift of the "clopening."

84.    Similarly, NYC Subclass Members were not paid the required premiums for performing "clopenings." As with Ms. Carpenter, Shake Shack gave NYC Subclass Members no opportunity to decline "clopenings" and failed to timely obtain the consent of NYC Subclass Members to perform "clopenings:."

85.    Based on Ms. Carpenter's observations and conversations, FLSA Collective and Class Members were similarly deprived of premiums for delayed schedule changes and "clopenings" in violation of the NYCFWW.

***Age and Caregiver Status Discrimination, Retaliation, Hostile Work Environment, and Wrongful Discharge Claims***

86.     As a Shift Manager at Shake Shack Kings Plaza, Ms. Carpenter reported to management for the location, including General Manager ("GM"), Assistant General Manager ("AGM"), and was also supervised by other Managers below the GM and AGM.

87.     On approximately May 1, 2024, Ms. Lovelace, who is approximately 30 years old, was appointed GM of Shake Shack Kings Plaza. At the same time, Giuliano Fernandez, who is approximately 35-40, was appointed AGM.

88.     Other Managers to whom Ms. Carpenter reported to in May and June 2024 include Nicholas Barnes.

89.     From the start of her tenure as GM of the Kings Plaza Shake Shack location on approximately May 1, 2024, and Ms. Carpenter's unlawful termination on June 12, 2024, Ms. Lovelace subjected Ms. Carpenter to unrelenting harassment due to her bias against Ms. Carpenter's age and caregiver status.

90.     Ms. Lovelace treated Ms. Carpenter as incompetent and stupid because of bias towards her as an older person.

91.      Ms. Lovelace singled out Ms. Carpenter for verbal reprimands on a daily basis. Ms. Lovelace would monitor Ms. Carpenter intently as she worked, looking for an excuse to find fault with Ms. Carpenter and yell at her in front of the whole team.

92.     On a daily basis, Ms. Lovelace baselessly attacked Ms. Carpenter as unable to perform basic aspects of her job (i.e., food preparation, managing the duties of team members) properly due to her age.

93.     Ms. Lovelace also unilaterally imposed questionable new policies that appeared against overall company policy and potentially unlawful, and then berated Ms. Carpenter for allegedly not following the policies.  For example, Ms. Lovelace instituted a new policy that

customers would not be permitted to use the restroom in the store. On or about May 13, 2024, Ms. Carpenter permitted a paying customer to use the restroom.

94.    Upon learning about Ms. Carpenter's trivial violation of this bizarre ad-hoc rule (which is not in place in any other Shake Shack that Ms. Carpenter knows of), Ms. Lovelace admonished Ms. Carpenter severely.

95.    Ms. Lovelace explicitly mocked and ridiculed Ms. Carpenter on a daily basis using insulting, pejorative and ageist language.

96.    Ms. Lovelace repeatedly and openly accused Ms. Carpenter of being too old to do her job adequately, telling Ms. Carpenter frequently "**You're getting old, girl."**

97.    Ms. Lovelace also frequently talked down to Ms. Carpenter in an insultingly patronizing and disrespectful tone, as if addressing an elderly person experiencing cognitive decline, yelling at Ms. Carpenter "**Do you understand what I'm saying**?"

98.    Ms. Lovelace was particularly displeased that younger employees of the Kings Plaza Shake Shack looked up to Ms. Carpenter as a figure of wisdom and authority as a woman in her 50s, because she saw this as a challenge to her own authority as GM. Ms. Lovelace repeatedly admonished Ms. Carpenter to stop acting as if she were the "**grandmother**" of younger employees of the store and stay in her lane.

99.    These comments and actions all demonstrated age-based discrimination towards Ms. Carpenter.

100.    Ms. Carpenter was deeply distressed by the constant ageist harassment and discrimination that she was facing from Ms. Lovelace, which was reducing Ms. Carpenter to tears in the workplace on a daily basis.

101.    Team Members at Kings Plaza Shake Shack witnessed Ms. Lovelace's age-based harassment of Ms. Carpenter, including Mercedes Chambers and Shawanna James. Such employees agreed that Ms. Carpenter's conduct was reflective of discrimination.

102.    Customers at Kings Plaza Shake Shack similarly witnessed Ms. Lovelace's ageist animus towards Ms. Carpenter.

103.    Shake Shack's Code of Conduct provides as follows:

*Any member of management who has reason to believe that an employee has been the victim of harassment or discrimination or who receives a report of alleged harassment or discrimination is required to report it to the People Resources Department immediately.*

104.    Ms. Carpenter made repeated complaints about the discrimination and harassment to which she was subjected to Management. However, no action was taken by Shake Shack management.

105.    On or about May 15, 2024, Ms. Carpenter made a protected complaint to a Manager, Nicholas Barnes, telling him that she felt that Ms. Lovelace was subjecting her to discrimination and harassment based on her age. Mr. Barnes agreed that Ms. Lovelace's actions discriminatory and amounted to harassment. Although Ms. Carpenter repeated these complaints in subsequent conversations with Mr. Barnes during late May 2024, Shake Shack failed to investigate or take any other action to address the egregious discrimination that Ms. Carpenter endured.

106.    On or about May 31, 2024, a young Team Member at Kings Plaza Shake Shack, Kailah Brice, who is about 17 years old, approached Ms. Carpenter crying and in a state of severe distress. Ms. Brice informed Ms. Carpenter that she was distraught because she had just learned that her grandmother has cancer.

107.    As noted, Ms. Carpenter serves as caregiver to her father who is battling cancer. Because she faces a similar challenge in her own life, Ms. Carpenter felt a particular empathy to Ms. Brice's situation. Ms. Carpenter embraced Ms. Brice and consoled her.

108.    Following this incident, Ms. Lovelace summoned Ms. Carpenter to her office and severely reprimanded her for consoling Ms. Brice, claiming that comforting a team member is against Shake Shack policy. Ms. Lovelace further admonished Ms. Carpenter again to stop acting like she was the "**grandmother**" of younger employees such as Ms. Brice. Referring to Ms. Carpenter as a "grandmother" demonstrates ageist animus.

109.    Ms. Carpenter pointed out that comforting a colleague in distress was entirely consistent with Shack Shack's professed corporate values.

110.    Ms. Carpenter complained to Ms. Lovelace about the ageist discrimination and harassment to which she was subject, questioning Ms. Lovelace's characterization of her as a "grandmother."

111.    Ms. Carpenter further complained to Ms. Lovelace that she serves as caregiver to her father, who is also battling cancer, and felt compelled to comfort Ms. Brice based on her status as a caregiver for an ailing loved one.

112.    In response to Ms. Carpenter's protected complaints, Ms. Lovelace chastised Ms. Carpenter. Ms. Lovelace threatened to terminate Ms. Carpenter's employment for raising her caregiver status and questioned Ms. Carpenter's ability to do her job in view of her caregiver responsibilities.

113.    Following the May 31, 2024, reprimand by Ms. Lovelace, Ms. Carpenter complained again to Mr. Barnes about Ms. Lovelace's discriminatory treatment and harassment. Despite this complaint, Shake Shack took no action to address the unlawful actions reported.

114.    Despite Ms. Carpenter's repeat complaints to management, and in clear violation of codified Shake Shack policy, Shake Shack failed to take any remedial action.

115.    During a shift on June 5, 2024, Ms. Carpenter noticed that Romeo, a Team Member, was sitting down and not performing his duties.

116.    Ms. Carpenter asked Romeo why he was not performing his duties. Romeo responded that his leg was hurting.

117.    Shake Shack has strict policies requiring employees to be working at all times when present at work. Accordingly, Ms. Carpenter called AGM Giuliano Fernandez, who was not at the restaurant, to report the situation and request guidance.

118.    Mr. Fernandez told Ms. Carpenter to direct Romeo to clock out and go home if he could not work, or alternatively get back to work if he was going to remain at work.

119.    Ms. Carpenter followed Mr. Fernandez's directive and without saying anything, Romeo departed from the workplace without managerial permission.

120.    This incident was witnessed by Shake Shack employees, including Kailah Brice and others.

121.    Kailah Brice advised Ms. Carpenter that Romeo had told Kailah that he was leaving because Ms. Carpenter was "pissing him off." However, Ms. Carpenter had not had any interaction with Romeo that day, other than directing him to his station.

122.    Ms. Carpenter did not engage in any argument with Romeo. Rather, Romeo walked out on his own volition.

123.    Under Shake Shack policy, leaving work without managerial permission constitutes job abandonment.

124.    Accordingly, Ms. Carpenter reported Romeo's job abandonment to Shake Shack.

125.    Ms. Carpenter was not notified of any investigation of Romeo's job abandonment, or any investigation of the circumstances that precipitated the same.

126.    Ms. Carpenter was not interviewed regarding the foregoing incidents. And based on conversation with the other witnesses, Shake Shack never interviewed the other witnesses either.

127.    On June 12, 2024, 5 days after Romeo's job abandonment, Ms. Carpenter was abruptly terminated in the middle of a shift. Ms. Carpenter did not receive notice or opportunity to challenge the termination.

128.    Ms. Carpenter's termination notice, which was authored by Ms. Lovelace, falsely accuses Ms. Carpenter of "unprofessional behavior and violation of company policy."

129.    The termination notice further falsely smears Ms. Carpenter, stating that she "engaged in a verbal argument with another Team member about their need to rest," and that "during the investigation," it was revealed that Ms. Carpenter "did not follow Shack procedure and displayed unprofessional behavior making an injured team member feel uncomfortable in the workplace."

130.    Ms. Carpenter submits that these claims are **outright lies**.

131.    There was no investigation. Ms. Carpenter did not violate procedure. Ms. Carpenter did not display any unprofessional behavior. As explained, Ms. Carpenter acted **at the direct behest of her supervisor.**

132.    Ms. Lovelace's claim that an "investigation" occurred is **preposterous.** Neither Ms. Carpenter nor any other witness to the incident was ever interviewed.

133.    The termination notice proceeds to state the following dishonest, vague, and plainly pretextual rationale for terminating Ms. Carpenter:

> *Crystal's actions and behaviors does [sic] not meet the expectations of a Shift Manager at Shake Shack and are not consistent with the Shack Pact and constitute serious violations [sic] Shake Shack's Code of Conduct, which prohibits, among other things, "Unprofessional behavior". Crystal has continued to make unprofessional remarks to team members which has result [sic] in immediate termination.*

134.    The termination notice does not provide any details whatsoever regarding what Ms. Carpenter allegedly did or said to merit "immediate termination."

135.    The termination notice fails to specifically state how Ms. Carpenter's behavior was unprofessional, or inconsistent with the Shack Pact or the Shake Shack Code of Conduct.

136.    These circumstances, and the contents of the termination notice, make it patently obvious that the termination notice's so-called "explanation" was in fact a pretext invented to cover up discriminatory and retaliatory motivations.

137.    Following the termination, Ms. Carpenter called Shake Shack's People Resources Hotline and left a voicemail complaining she had been fired due to discrimination. However, Shake Shack never responded. There was evidently no investigation of this complaint of discrimination.

138.    The record shows that Ms. Carpenter was terminated due to age and caregiver status discrimination, and in retaliation for repeated protected complaints regarding the discrimination and harassment to which she was subjected.

139.    Moreover, the termination lacked the "good cause" or "legitimate business reasons" required to fire a fast-food worker under the NYWDL.

140.    Ms. Carpenter has suffered lost wages, consequential damages and severe emotional distress as a result of Shake Shack's unlawful decision to terminate her.

141.    Plaintiff retained TA Legal Group PLLC as counsel in this litigation and agreed to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### Count I – Age Discrimination, Retaliation, and Hostile Work Environment Against All Defendants In Violation of The ADEA

142.    Plaintiff reincorporates by reference all preceding paragraphs as if set forth herein.

143.    Plaintiff is over 40 and thus qualifies for protections against discrimination and retaliation under the ADEA.

144.    Plaintiff was qualified for her position.

145.    Plaintiff was subject to age discrimination, retaliation, and a hostile work environment by Defendants.

146.    Defendants engaged in discriminatory practices, including harassment on the basis of age and unlawful termination.

147.    Defendants retaliated against Plaintiff for engaging in protected activities, including making protected complaints and opposing discriminatory practices.

148.    Plaintiff experienced harassment and a hostile work environment and other adverse treatment due to her age.

149.    The harassment was sufficiently severe and pervasive to alter the conditions of employment and create an abusive working environment.

150.    Shake Shack fomented the discrimination, harassment and hostile work environment

151.    As a direct and proximate result of Shake Shack's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among family, friends, and co-workers, damages to her good reputation, disruption of her personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

152.    Shake Shack's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

153.    Plaintiff is entitled to all remedies available for violations of the ADEA, including declaratory, injunctive and equitable relief, and monetary damages, including economic damages, compensatory damages, punitive damages, and attorneys' fees and costs.

**Count II – Age and Caregiver Status Discrimination, Retaliation, and Hostile Work and Educational Environment Against Shake Shack Under the NYSHRL and NYCHRL**

154.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

155.    Defendants have discriminated against Plaintiff in violation of the New York State Human Rights Law by subjecting her to disparate treatment on the basis of age and caregiver status. Plaintiff has suffered disparate treatment based on her age and status as a caregiver to her father, as a result of Defendants' wrongful conduct.

156.    Plaintiff was subjected to unlawful discrimination, harassment, retaliation, and a hostile work environment due to being 52 years old and a caregiver.

157.    Shake Shack has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated employees not of Plaintiff's protected classes and by

subjecting her to severe and pervasive harassment, a hostile work environment, disparate terms and conditions of employment, and other forms of discrimination on the basis of age and caregiver status in violation of the law.

158.    Plaintiff repeatedly complained to Shake Shack about the severe and pervasive discrimination, harassment, hostile work environment and retaliation she was subjected to during employment with Shake Shack.

159.    Plaintiff notified Shake Shack of the severe discrimination, sexual harassment, hostile work environment, and retaliation he was subjected to and repeatedly protested to the harassment and discrimination.

160.    Plaintiff's complaints were repeatedly ignored and discouraged by Shake Shack in accordance with Shake Shack's policy, practice, and/or custom of discrimination and retaliation.

161.    Shake Shack, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of discrimination, harassment, hostile work environment, and retaliation.

162.    Because she protested Shake Shack's unlawful behavior, Plaintiff was subjected to retaliation throughout the course of her employment and after termination.

163.    The retaliation substantially interfered with Plaintiff's employment and created an intimidating, offensive, and hostile work environment.

164.    Defendants knew or should have known about the retaliation and the effect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

165.    As a direct and proximate result of Shake Shack's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to

her employability and earning capacity, painful embarrassment among family, friends, and co-workers, damages to her good reputation, disruption of her personal life, familial discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

166.    The discrimination, hostile work environment, and retaliation that Plaintiff suffered while employed by Shake Shack severely affected the terms and conditions of employment.

167.    Shake Shack's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

168.    By reason of Shake Shack's discrimination and retaliation, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law as to all Defendants.

169.    Plaintiff shall seek attorney's fees and punitive damages.

### Count III – Wrongful Discharge in Violation of the NYCWDL

170.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

171.    Defendant qualifies as a "fast-food" employer for NYCWDL purposes.

172.    Plaintiff was an employee of Shake Shack in New York City and thus entitled to NYCWDL protections.

173.    Defendant terminated Plaintiff without good cause or legitimate business reasons, in violation of the NYCWDL.

174.    As a result of Defendant's actions, Plaintiff has suffered damages, including lost wages, emotional distress, penalties and other compensatory damages, in addition to applicable penalties, punitive damages and other damages available under law.

### Count IV – Collective-Wide Violation of the FLSA

175.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

176.    At all relevant times, Shake Shack has been and continues to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

177.    At all relevant times, Shake Shack employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

178.    At all relevant times, Shake Shack had gross annual revenues in excess of $500,000.

179.    At all relevant times, Shake Shack violated the FLSA because of their policy and practice of failing to pay Plaintiff the full amount of overtime wages.

180.    Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendant. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their

failure to compensate Plaintiff and FLSA Collective Members for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

181.    Defendant failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

182.    As a direct and proximate result of Defendant's willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

183.    Due to the intentional, willful and unlawful acts of Defendant, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime wages. Plaintiff is entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## Count V – Rule 23 Class-Wide Violation of the NYLL

184.    Plaintiff realleges and incorporates all the foregoing paragraphs of this Complaint as if fully set forth herein.

185.    At all relevant times, Plaintiff and Class Members were employed by Defendant within the meaning of the NYLL §§ 2 and 651.

186.    Defendant knowingly and willfully failed to pay Plaintiff and Class Members overtime wages in violation of the NYLL.

187.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage statements as required under the NYLL.

188.    Defendant knowingly and willfully failed to provide Plaintiff and Class Members with proper wage and hour notices as required under the NYLL.

189.    Due to the Defendant's NYLL violations, Plaintiff and Class Members are entitled to recover from Defendant overtime wages, attorneys' fees and costs, liquidated damages, statutory penalties, costs and disbursements of the action, and interest pursuant to the NYLL.

### Count VI – NYC Subclass-Wide Violations of the NYCFWW

190.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

191.    Defendant qualifies as a "fast-food" employer for NYCWDL purposes.

192.    Plaintiff was an employee of Shake Shack in New York City and thus entitled to NYCWDL protections.

193.    Defendant failed to pay Plaintiff premiums for last-minute schedule changes and "clopening" shifts, as required under the NYCFWW.

194.    As a result of Defendant's actions, Plaintiff has suffered damages, including unpaid wages, penalties, and other compensatory damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

- A declaratory judgment that the practices complained of herein are unlawful under ADEA, NYSHRL, and the NYCHRL, NYCFWW, NYCWDL, the FLSA, and the NYLL,

- An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein.

- Awards of unpaid wages and overtime under the FLSA and NYLL.

- Awards of liquidated damages under the FLSA and NYLL.

- An award of unpaid premiums due under .

- Awards of monetary damages under ADEA, NYSHRL, NYCHRL, and/or NYCWDL including awards of:

- ○ Economic Damages: Compensation for lost back and front wages, bonuses, benefits, retirement plan losses, and other economic harms resulting from Shake Shack's discriminatory and retaliatory actions.
- ○ Compensatory Damages: Compensation for emotional distress, humiliation, and damage to Plaintiff's professional reputation caused by Shake Shack's conduct.
- ○ Punitive Damages: Punitive damages to deter Shake Shack and others from engaging in similar unlawful conduct in the future.

- An award of attorneys' fees and costs and expenses incurred in pursuing the action.

- An award of pre-judgment and post-judgment interests, costs and expenses of this action together with attorneys' and expert fees and statutory penalties;

- Certification of this matter as a FLSA Collective Action and appointment of Plaintiff as the representative of FLSA Collective Members.

- Certification of this matter as a Rule 23 Class Action and appointment of Plaintiff as the representative of Class Members and NYC Subclass Members.

- Any additional relief the Court deems just and proper to remedy the harm caused by Shake Shack's unlawful actions.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated:   Huntington, NY
         March 13, 2024

Respectfully Submitted,
**TA LEGAL GROUP PLLC**

By: _____
Taimur Alamgir, Esq. (TA 9007)
315 Main Street, Second Floor
Huntington, NY 11743
Tel. (914) 552-2669
tim@talegalgroup.com

34